IC

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**RECEIVED**

MAY 13 2025 *L)*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| Siobhan K. Watkins<br>Plaintiff | ) ) ) ) | **United States District Court**<br>**Northern District of Illinois** |
| v. | ) ) |  |
| Clerk of the Circuit<br>Court of Cook County<br>Defendant | ) ) ) ) | 1:25-cv-05264<br>Judge Robert W. Gettleman<br>Magistrate Judge Keri L. Holleb Hotaling<br>RANDOM / Cat. 2 |

## COMPLAINT

### I. Jurisdiction and Venue

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), as this action arises under Title VII of the Civil Rights Act of 1964.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as the unlawful employment practices were committed within this district.

### II. Parties

3. Plaintiff, Siobhan K. Watkins, is a resident of Country Club Hills, Illinois.

4. Defendant, Clerk of the Circuit Court of Cook County, Illinois, is a corporation operating in Illinois and was Plaintiff's employer at all relevant times.

### III. Exhaustion of Administrative Remedies

5. Plaintiff filed a charge of discrimination (Charge No. 440-2024-10925) with the EEOC in 2024.

6. On February 25, 2025, the EEOC issued a Notice of Right to Sue, which Plaintiff received shortly thereafter. A true and correct copy of the Notice of Right to Sue is attached hereto as Exhibit A.

7. The Office of Inspector General (OIG) publicly substantiated Plaintiff's harassment complaint. A true and correct copy of the OIG's public report is attached hereto as Exhibit B.

8. This Complaint is being filed within 90 days of receipt of the Right to Sue Notice.

1

## IV. Statement of Facts

8. In June 2024, Plaintiff filed an internal complaint alleging harassment and a toxic workplace environment, a protected activity under Title VII.

9. An Office of Inspector General (OIG) investigation confirmed Plaintiff's complaint in a public report.

10. Following this, Plaintiff was subjected to heightened scrutiny beginning the week of October 8, 2024.

11. Plaintiff was issued a Notice of Employee Action on October 11, 2024, without prior disciplinary history.

12. The plaintiff's reports of retaliation to General Counsel and OIG went unanswered.

13. The plaintiff was terminated on October 18, 2024.

## V. Claims for Relief

Count I – Retaliation in Violation of Title VII

14. Plaintiff realleges and incorporates by reference paragraphs 1 through 13.

15. Defendant retaliated against Plaintiff for engaging in protected activity by subjecting her to adverse employment actions, including termination.

16. These actions constitute unlawful retaliation in violation of Title VII.

Count II – Hostile Work Environment

17. Plaintiff realleges and incorporates by reference paragraphs 1 through 13.

18. Defendant's conduct created a hostile work environment that was severe and pervasive, violating Title VII.

## VI. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare that the acts and practices complained of are in violation of Title VII;

b. Order Defendant to award front pay in lieu of reinstatement;

c. Award back pay and compensatory damages;

d. Award punitive damages as permitted by law;

e. Award costs, interest, and reasonable attorney's fees if applicable;

f. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Siobhan K. Watkins

18813 Maple Ave

Country Club Hills, IL 60478

708-546-6238

siobhanwatkins3@gmail.com

May 13, 2025

Exhibits:

Exhibit A – EEOC Notice of Right to Sue

Exhibit B – OIG Findings Report

*Exhibit A - EEOC Right to Sue Notice*

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearbom Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/25/2025

**To:** Dr. Siobhan Watkins
18813 Maple Ave
COUNTRY CLUB HILLS, IL 60478
Charge No: 440-2024-10925

EEOC Representative and email:    THIEN-KIM DINH
Investigator
thien-kim.dinh@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2024-10925.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
02/25/2025

Amrith Kaur Aakre
District Director

**Cc:**
50 W WASHINGTON ST RM 1001
CHICAGO, IL 60602

Mary Anne Spillane
Clerk of the Circuit Court of Cook County
50 West Washington St. Room 1003
Chicago, IL 60602

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2024-10925 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2024-10925 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

*Exhibit B - OIG Findings Report*

THE OFFICE OF THE INSPECTOR GENERAL
OF THE CLERK OF THE CIRCUIT COURT OF
COOK COUNTY

**ANTHONY LINH NGUYEN**
INSPECTOR GENERAL

October 15, 2024

Re: Inspector General Quarterly Report (3rd Qtr. 2024)

Dear Honorable Clerk Iris Martinez, Executive Staff, and all the residents whom we serve:

This report is written in accordance with the best practices prescribed by the Association of Inspectors General (AIG) Green Book, to apprise you of the activities of the Clerk of the Circuit Court (CCC) Office of the Inspector General (OIG) during the period beginning July 1, 2024, through September 30, 2024.

With a new Clerk being sworn in prior to when the next OIG Quarterly Report is due, the OIG wants to express its appreciation and gratitude for Madame Clerk Martinez. Tremendous improvement to the OIG has been made in the last four years:

- Investigators and the Inspector General earned certifications from the Association of Inspectors General
- Digitally scanned old paper records and maintains all current records digitally.
- Created an electronic database to maintain and keep track of its records
- Created an internal investigation manual to standardize its investigation process to assure quality and consistency
- Developed a process for the OIG to refer and keep track of management inquiries to relevant departments
- Established a public website with published quarterly reports to promote transparency and public accountability

These improvements would not have been possible without Madame Clerk and her unwavering support for the independence of the OIG office and its work – thank you very much.

### OIG Q3 Complaints

The OIG had 49 open cases (case files and Management Inquiries (MIs)) pending at the beginning of Q3. There were 15[1] open MIs and 34 open case files. Of the 34 open case files pending at the beginning of Q2: one from Q4 2022, 10 from Q1 2023, 10 from Q2 2023, seven from Q1 2024, six from Q2 2024. 30 of the 34 pending case files were closed. All 15 of the pending MIs were closed.

---

[1] 2024Q2 Quarterly Report indicated seven MIs at the end of the quarter, however updates to eight other MIs were not included until after the Report was submitted. We apologize for this discrepancy.

During Q3, the OIG received a total of 153 complaints through the OIG telephone hotline, mail, web, email, fax, direct report, and the QR Code Customer Service Survey. Of the 153 complaints, 14 complaints came from employee complainants and 139 came from non-employee complainants. Out of the 153 complaints, 143 were classified as MIs, and 10 opened as case files investigated by the OIG.

Of the 202 cases active during Q3: (147) MIs were closed, 36 case files were closed (23 were administratively closed, 13 were closed via summary report), leaving 19 total cases (8 case files, 11 MIs) pending at the end of the quarter.

### OIG Summary Reports

During 2024Q3, the OIG closed 36 total case files with 13 closed as summary reports. The following is a general description of the cases closed via summary report, the OIG's findings, and basis for the findings.

23-06-279: The OIG received an anonymous complaint alleging nepotism, misuse of county vehicles, along with other allegations. The OIG was also made aware that the Board of Ethics received the same complaint and initiated an investigation, so the OIG deferred to their investigation and findings, which found inconclusive evidence to support the allegations.

24-02-088: An investigation into the theft of a Cook County court laptop from a courtroom revealed a lapse in the management of technology devices by a Management Information Systems (MIS) Shakman-exempt manager. Despite previous recommendations to improve security measures, the department failed to implement effective safeguards, leading to another theft incident. The investigation found that the Shakman-exempt manager made assumptions about security, assuming courtrooms were secure enough to leave unassigned devices without proper supervision or locking procedures. There was also inadequate accountability, with no designated individual for daily laptop checks and no sign-out sheets. Furthermore, it was assumed that the current security software was sufficient despite certain software features being non-functional and/or being disabled and frequently needing updates.

The investigation also uncovered a lack of communication and training among departments and ineffective inventory management. The paper record of release forms signed by employees was not reviewed or accounted for. The OIG has identified the Shakman-exempt manager as responsible for facilitating the deployment of technological devices and concludes that their lack of communication and oversight led to a series of security lapses. Overall, the OIG finds that allegations are sustained and recommends further action to improve security measures and accountability within MIS.

24-03-161: An administrative assistant filed a complaint against their Shakman-exempt manager, claiming that the manager created a hostile work environment with unfair demands and discriminatory remarks. After a thorough investigation, the OIG's findings were inconclusive, noting that the manager allowed breaks and lunches and did not restrict them. Various witnesses portrayed the manager differently than the assistant, stating the manager was proactive and maintained standard procedures

regarding breaks, countering the assertions of misconduct. While some concerns regarding the manager's communication and management style were raised, they were not deemed severe enough to constitute harassment or create a hostile work environment as alleged.

To prevent similar issues in the future, the OIG recommended that departments establish clear guidelines about break times and expectations for all. The OIG also suggested that the manager receive additional training in leadership and communication.

24-04-213: An office clerk accused a manager of making a racist and inappropriate comment in their presence, bullying them, and touching them with force that made them uncomfortable. The clerk alleged the manager asked them, "What is the highest compliment a black person could give to a white person," and making a statement to the effect of, "Well I donated an organ to an African American person, so I can't possibly be racist."

The OIG interviewed all witnesses the complainant mentioned, but most of their statements did not support the complainant's allegations. The majority of the office clerks who stated that they have heard those statements, stated that they only heard it from the complainant and never from the manager. The complainant further claimed other employees were offended by the manager's question but all employees denied being offended to the OIG. The manager admitted to asking the question, "What is the highest compliment an African American woman can give to someone?" The manager explained the context in which they asked the question, and while the question may have been insensitive it did not raise to the level of a major cause infraction, nor a violation of any rule or policy.

The OIG found evidence of the allegations of bullying as inconclusive. The complainant claimed other employees also felt bullied and targeted by management but all employees denied ever telling the complainant they felt targeted and stated that management is just doing their jobs. They also stated that the complainant "takes things personally" and takes direction and instruction as personal attacks. The allegation of a physical altercation was non-sustained due to all individuals that were listed as present denied the altercation happening.

The complainant's friend, also an office clerk, made additional allegations against the manager and the ACDC for verbal altercation and bullying. The OIG finds the allegations to be an exaggeration and misunderstanding on both the complainant and the office clerk's part. The only interviewees' stories that corroborated the allegations were the complainant and the office clerk. The fact that the two are close friends and that their complaints were so similar raised skepticism and felt scripted, especially after all other interviewees confirmed that when the complainant complains about something the office clerk follows along and complains about the same things. The OIG recommended the two be reminded of false allegations portion of the Anti-Discrimination Anti-Harassment policy.

The alleged statements did not rise to the level of a major cause infraction or a violation of policy; however, the OIG recommended that management be retrained in communication skills and reminded that management is held to a higher standard.

24-04-234: A customer filed a complaint against the CCC office accusing the CCC office clerks of negligence in the performance of their duties. The customer stated he came to the CCC office for case document copies. The customer stated the office clerks didn't assist him with his request. The customer stated that he recently had a medical procedure, and the confusion with the office clerks caused him to fall; he got up and left the office. The customer stated when he fell, he refused any support from the office staff because he did not trust them. It was discovered during the investigation that the office clerks did try to assist the customer with his request for document copies, but that the customer didn't have a fee waiver and was upset with the cost of the copies. A supervisor assisted the customer, and he eventually received the copies he requested. The allegation that the office clerks were negligent in the performance of their duties is non-sustained.

24-04-235: A customer filed a complaint against the CCC office manager and clerks for refusing to process his court case motions and were negligent in the performance of their duties. The customer made several attempts in court to get a copy of his apartment lease from his landlord. The customer was disruptive during his court appearances. The customer attempted to place another motion request before the judge; however, the judge issued an order that stated the customer can no longer make a motion request for this case, unless the customer receives a leave from court. The CCC office manager and clerks could not process the customer's motions request due to the judge's order. The allegations that the office manager and clerk employees are non-sustained.

24-06-280: An HR employee alleged a Shakman-exempt manager of creating a hostile work environment, interfering with their job performance, and sex discrimination. The OIG interviewed multiple employees, and the majority of the interviewees stated that they have also had issues with the manager and described them as passive aggressive, defensive, condescending, demeaning, and territorial. The OIG believes that based on most of the interviewed employees' experiences, the manager has come off as rude and insolent, which led some to feel the behavior created a toxic work environment.

As a supervisory employee, the manager is held to a higher standard of conduct, and thus the OIG sustained allegations of violation of the Code of Ethics and Standards of Conduct.

The HR employee further alleged the manager of intimidating them for their "intellectual property," and for having a close relationship to an upper-level Shakman-exempt manager, so much so that it caused a conflict of interest where the manager would not get reprimanded. There is no expectation of privacy when using Clerk's Office MIS resources, nor do users have personal privacy interest in anything created, received, or stored on Clerk's Office internet or email systems. The allegation was non-sustained.

All interviewees acknowledged the manager, and the upper-level Shakman-exempt manager have a personal relationship. Both the manager and the upper-level Shakman-exempt manager denied their friendship interfered with their job responsibilities. When asked, the exempt manager denied reaching out to the upper-level Shakman-exempt manager or speaking with them during an incident. The OIG found based on the preponderance of evidence the denial as inaccurate and that they attempted to cover it up. The exempt manager signed the OIG's attestation of oath before their interview. The OIG added sustained findings for falsifying any other records through

Page 4

misstatement or omission of pertinent facts or information; engaging in conduct unbecoming an employee of the Clerk's Office; and failing to cooperate with an investigation conducted pursuant to the provisions of the Employment Plan or Employee Handbook.

The OIG also sustained findings against the HR employee for insubordination and for sharing confidential information with other employees and non-employees.

The OIG could not find any evidence to prove that the exempt manager discriminated against anyone or mistreated anyone on the basis of sex, race, or color, so the OIG findings for these allegations are inconclusive.

24-06-303: An investigation into the allegations against a financial clerk disclosed issues of communication and procedures in the department. The financial clerk was accused of being insubordinate for not filling out a Financial Discrepancy Form that a Shakman-exempt manager requested over a month after noticing a $12.00 shortage. The financial clerk claimed she was confused about the discrepancy process and believed the shortage could be due to another clerk's mistake. Most clerks had not received training in handling such discrepancies, which added to the confusion. Additionally, both department Shakman-exempt managers admitted they were unclear about the process of handling discrepancies until after the incident.

Although both managers claimed that employees should not share cash drawers, that policy wasn't enforced, and surveillance footage showed another employee involved in the disputed transaction.

Ultimately, the investigation found that the accusations against the clerk did not hold. It was recommended that all clerks and managers get proper training on financial policies, make these rules easily accessible, and promote better communication to avoid problems like this in the future.

24-08-413: An HR employee alleged a Shakman-exempt manager created a hostile work environment, interfered with their job performance, and discriminated against them based on sex. The complainant further alleged an upper-level Shakman-exempt manager of knowing about other employees' issues with the manager and doing nothing about it because of the upper-level Shakman-exempt manager and the exempt manager have a personal friendship. After a thorough investigation, the OIG found the allegations against the upper-level Shakman-exempt manager for conflict of interest were inconclusive.

During its investigation, the OIG discovered that a different Shakman-exempt manager told the upper-level Shakman-exempt manager that they felt racially discriminated against by the manager. The upper-level Shakman-exempt manager stated when they heard the complaint, they stated they did not believe it was about race and excused themselves from the conversation.

The upper-level Shakman-exempt manager is a supervisory employee and therefore held to a higher standard; the upper-level Shakman-exempt manager should have reported the racial discrimination complaint. The OIG sustained findings against the upper-level Shakman-exempt manager for omitting pertinent facts during their interview, engaging in conduct unbecoming an employee of the Clerk's Office, and failing to cooperate with an investigation.

24-07-326: An employee alleged that their Shakman-exempt supervisor insulted and cursed at them during an operational training session and work assignments, which caused the employee emotional stress. The employee stated they loaned the supervisor money, but the supervisor refused to pay the employee back the money they borrowed from the employee. The employee filed a workplace harassment complaint against their supervisor. The supervisor then alleged that the employee entered their office, yanked their hair, cursed at and threatened them, causing the supervisor to file an allegation of workplace violence against the employee.

The investigation revealed that there was a long personal history between the employee and the supervisor, which included an intimate relationship. The supervisor admitted they insulted the employee but denied cussing at the employee. The supervisor denied that the employee loaned them money; however, the supervisor admitted they borrowed money from the employee in the past.

The supervisor violated the policy against seeking or maintaining an intimate relationship with a subordinate and failing to notify their direct supervisor immediately. The employee violated policies against verbal or physical altercations with another employee and conduct unbecoming of a CCC employee.

24-08-436: A court clerk filed a sexual harassment complaint against another court clerk employee. The complaint stated they were talking to a judicial employee, when the other court clerk employee approached them from behind and placed their hand on their shoulder, then whispered in their ear; as the co-worker whispered in their ear, the complainant stated they felt the co-worker's private area on their leg. The complainant spoke to the co-worker about their concern and disappointment with their actions. The complainant stated the co-worker immediately apologized and stated they didn't know the complainant felt them. The co-worker asked the complainant if they were sure because the accused had their phone in their front pocket and stated the complainant may have felt that.

The judicial employee stated they were sitting at their desk as they talked to the complainant, who was standing at the door. The judicial employee stated they saw the co-worker whisper in the complainant's ear; that they could not see anybody contact the co-worker may have made with the complainant. The co-worker stated they immediately apologized when they learned of the contact from the complainant. The co-worker stated that they would never disrespect the complainant in that manner because the complainant is a friend, and they have known each other for a long time. The co-worker also stated although they were close in proximity to the complainant, they spoke loud enough for the judicial employee to hear them. The co-worker admitted they placed their hand on the complainant's shoulder, and they believe that the complainant may have felt their phone, which they keep in their front pocket. The allegations that the co-worker violated the Sexual Harassment Policy along with other related policies are sustained due to the co-worker inappropriately entering the personal space of the complainant and making unwanted physical contact.

24-09-449: The investigation into a financial clerk's allegation of sexual harassment by a Shakman-exempt manager found that the manager's comments and actions crossed professional boundaries. The financial clerk alleged that the manager made inappropriate comments about their appearance and

marital status and referred to the financial clerk as their child despite them being unrelated. The financial clerk said this caused them discomfort and led them to avoid interactions with the manager.

The investigation found that the financial clerk 's narrative remained consistent throughout and was supported by witnesses. The investigation concluded that the manager's behavior was unprofessional, and the findings were sustained. As a result, mandatory re-training on professional conduct and boundaries was recommended. The manager resigned during the investigation.

<u>24-09-450</u>: Two office clerks accused each other of intimidation and bullying. After interviewing employees and reviewing camera footage, the OIG found the incident to be of two people awkwardly trying to get through a tight space at the same time misinterpreted by previous animosity and bias. Findings on the allegations were inconclusive, but the OIG recommended the employees be reminded to respect each other's space.

## OIG Projects

In Q3, the OIG continued working on the 2022Q2 joint investigation with the Office of the Independent Inspector General (OIIG). Both offices entered a memorandum of understanding relative to the investigation. The joint investigation allows our office to extend certain powers held by the OIIG in the investigation of employees of the Clerk of the Circuit Court. During Q3, the OIG completed all pending waves of this investigation.

The OIG found inaccuracies in the categorization of positions within the Clerk's Office in the Fiscal Year 2024 Cook County Appropriation Bill Volume 2. The Chief Financial Officer (CFO) mentioned that these lists came from the previous administration and had not been updated because there were more urgent financial matters to deal with. Although there are errors, the essential task of tracking salaries and employee numbers is fulfilled. After a meeting with the OIG, the CFO, and the Cook County auditor, everyone agreed that the lists need to be updated, even though it is a tedious task. The CFO noted that some updates have been made, but changes for other departments will have to wait for the new administration. The OIG concluded its audit but recommended that the incoming administration make these updates a priority.

## OIG Team

At the beginning of Q3 the OIG was composed of an Inspector General, Deputy Inspector General, four inspector general investigators, and an executive assistant. Half-way through September the OIG's Deputy Inspector General resigned and the position will be vacant until the new administration begins. Four members of the OIG team are certified by the Association of Inspectors General (AIG) as Certified Inspector General Investigators and Inspector General Inspectors/Evaluators and one member is certified as an Inspector General. Five team members of the OIG are members of the AIG IL and National Chapter. During Q4, all members of the OIG are scheduled to attend the AIG's Annual Training Conference in November.

Thank you for your time and attention, feel free to reach out with any concerns or questions.

Respectfully,

Anthony Linh Nguyen
Inspector General

CC: Tiffany Brooks, Chief of Staff
    Jim Dasakis, Chief Human Resource Officer
    Alvin Portis, General Counsel